IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

**ROSE MARIE WIRSHING,**

**Plaintiff**

**v.**                                                                       CIVIL NO. 11-2073 (GAG)

**BANCO SANTANDER DE PUERTO RICO, et al.,**

**Defendants.**

**MEMORANDUM OPINION**

This case involves a lawsuit by Plaintiff Rose Wirshing against her former employer, Banco Santander de Puerto Rico, in which she sought damages for retaliatory harassment by Defendant's managerial supervisors after she complained of sexual harassment in the workplace. Presently before the court is a Motion for Remittitur or New Trial submitted by Defendant. (See Docket No. 139.) The court previously denied Defendant's Renewed Judgment as a Matter of Law at Docket No. 137 and Motion for a New Trial at Docket No. 138, (see Docket No. 141), after the jury returned a verdict in favor of Plaintiff and awarded her $351,018.34 in compensatory damages and $3,500,000.00 in punitive damages. (See Docket No. 127.) Plaintiff After reviewing the parties' submissions, the evidence in the record, and the pertinent law, the court **GRANTS in part** and **DENIES in part** Defendant's motion for a remittitur and declines to order a new trial with regard to the damages imposed.

**Civil No. 11-2073 (GAG)**

**I.     Discussion**

     A.     <u>Compensatory Damages</u>

With respect to the jury's $351,018.34 compensatory damages award, Defendant argues that said award is grossly excessive in light of the evidence presented at trial, and, as such, it must be vacated in its entirety. (Docket No. 139 at 11-14.) It contends, citing cases outside of this circuit, that because Plaintiff failed to plead a constructive discharge claim and was not terminated, she is not entitled to any economic damages. (<u>Id.</u> at 11-12.) Further, Defendant argues that Plaintiff is not entitled to double damages under Puerto Rico Law No. 115, 29. P.R. LAWS ANN. tit. 29, § 194a et seq. ("Law 115") because during the time Plaintiff worked for Defendant, internal complaints did not constitute protected activity under Puerto Rico Law. (<u>Id.</u> at 15-17.) Plaintiff responds by arguing that the compensatory damages are entirely reasonable in light of the evidence presented to the jury and asks this court to allocate $1 in compensatory damages to the Title VII claim and the remaining $351,017.34 to her Law 115 claim to resolve the Title VII damages cap issue. (Docket No. 146 at 3-6.) Plaintiff also argues that she is entitled to double damages under Law 115 because it was undisputed that she had filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"), which did indeed constitute protected activity under Puerto Rico law at that time. (<u>Id.</u> at 6-7.) Lastly, Plaintiff argues that Defendant effectively waived its argument regarding the doubling of the damages when it failed to object to the court's proposed jury instructions. (<u>Id.</u> at 8.)

          i.     <u>The Jury's $351,018.34 Award</u>

"A party seeking remittitur bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand. . . . [T]he Supreme Court of Puerto Rico has indicated that it 'will

**Civil No. 11-2073 (GAG)**

not intervene in the decision on the estimation of damages issued by the lower courts, unless the amounts granted are ridiculously low or exaggeratedly high. . . . Nieves Cruz v. Universidad de Puerto Rico, 151 P.R. Dec. 150 (2000) . . . . Thus, Puerto Rico's 'exaggeratedly high' standard echoes the federal 'grossly excessive' standard." Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 174 (1st Cir. 2009). Furthermore, trial courts have "broad discretion" in deciding a remittitur because of the court's "greater familiarity with local community standards and with the witnesses' demeanor at the trial." Aponte-Rivera v. DHL Solutions, Inc., 650 F.3d 803, 810 (1st Cir. 2011). As such, this court will not "disturb an award of damages because it is extremely generous or because [it] think[s] the damages are considerably less." Id. (citing Koster v. Trans World Airlines, 181 F.3d 24, 34 (1st Cir. 1999)).

An analysis involving the applicable legal standard and a survey of the amounts of awards upheld by the First Circuit in other employment discrimination and retaliation contexts requires this court to uphold the jury's compensatory award in its entirety. Although Defendant is correct that Plaintiff failed to plead a claim for constructive discharge, it fails to cite a single binding case from this circuit that indicates that such a failure requires the jury to only consider non-economic damages when determining an award for the plaintiff. As such, the jury was allowed to consider Plaintiff's evidence of her salary when she stopped working for Defendant, her past bonuses, her mortgage expenses, and other disability income when estimating her damages. (See Docket No. 131 at 155-62.) Nevertheless, even if this court was to consider the $351,018.34 as solely non-economic damages because the jury did not make a distinction when rendering the award, as articulated below, the court finds that this award is not grossly excessive nor does it shock the conscious.

**Civil No. 11-2073 (GAG)**

With respect to evidence of damages, Plaintiff herself testified at that Defendant's hostile work environment left her feeling depressed, she endured consistent crying spells and panic attacks, she suffered from insomnia, had nightmares when she did sleep, and was generally anxious all of the time. (Docket No. 131 at 142-45.) Further, she testified that she would stay in her car upon arriving to work because she feared going inside and being subjected to the work environment that she had been enduring. (Id. at 142-43.) She further stated that she ended up taking a leave of absence from work in March, 2011 at the recommendation of her treating psychiatrist, Dr. Ilena Fumero-Pérez ("Dr. Fumero"), despite her desire to stay with the company and grow within it. (Id. at 134,144-45.) Plaintiff also proffered evidence of damages in the form of testimony of her husband, Gerardo Buxó-Janer, who stated that before the relevant time period of the hostile environment created by Defendant, Plaintiff was an independent woman who liked to go out and travel, including leaving Puerto Rico. (Docket No. 132 at 133.) He stated that their life together changed drastically when she became afraid to leave the house, had frequent panic attacks, insomnia, nightmares, vomiting, and diarrhea. (Id. at 134-42.) Plaintiff also proffered evidence of her damages through the expert testimony of Dr. Fumero, who has been treating Plaintiff for approximately twenty years. (Docket No. 131 at 61.) Dr. Fumero testified that although she diagnosed Plaintiff with episodes of major depression in 1994, in her professional opinion, Plaintiff's major depression and accompanying symptoms were triggered by the events that were occurring at work, not by her family problems that were occurring at the same time. (Id. at 63, 81-82, 87)  Although Defendant disputes Dr. Fumero's opinion that Plaintiff's mental condition was related to Defendant's actions, this was an evidence weighing and credibility determination to be made by the jury when it compared the evidence presented by both parties' expert witnesses.

**Civil No. 11-2073 (GAG)**

This evidence is in line with our circuit's precedent in which similar compensatory damages awards were upheld. First, Plaintiff proffered expert testimony opining on her mental and emotional condition, see Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 47 (1st Cir. 2009) (noting testimony by medical expert is relevant in determining whether damages are excessive), showed notable evidence of outward manifestations of emotional distress, see Monteagudo, 554 F.3d at 175 (plaintiff suffered for months by inability to sleep, wept every evening, and was depressed); O'Rourke v. City of Providence, 235 F.3d 713, 733 (1st Cir. 2001) (plaintiff was a "nervous wreck," often shaking uncontrollably, had difficulty sleeping, gained weight, spent days in bed and did not want to leave the house), and provided evidence of long term depression as a result of Defendant's actions. See Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 144-45 (1st Cir. 2009) (noting plaintiff continued to suffer from severe depression for five years after he left company); Valentin-Almeyda v. Municipality Of Aguadilla, 447 F.3d 85, 103 (1st Cir. 2006) (noting plaintiff received extended psychological treatment). This is in stark contrast to the cases in which damages have been reduced because the plaintiff did not introduce any testimony by a medical expert, show any notable evidence of outward manifestations of emotion distress, or present any evidence of long term depression or medical treatment. See Aponte-Rivera v. DHL Solutions, Inc., 650 F.3d at 811-12 (examining remittitur issues in discrimination cases).

Second, the jury's $351,018.34 compensatory damages award is commensurate with non-economic damages awards that have been upheld in the employment discrimination context. See Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 773-74 (1st Cir. 2010) (upholding $350,000 compensatory damages award, despite recognizing that it was generous, for plaintiff's emotion pain and suffering where plaintiff and her psychiatrist testified that she experienced depression); Monteagudo, 554 F.3d at 175 (upholding $333,000 award, despite recognition that it was

5

generous, where plaintiff suffered from depression, cried every evening, and was unable to sleep); McDonough v. City of Quincy, 452 F.3d 8, 22 (1st Cir. 2006) (upholding $300,000 award where "bulk of the award" was for emotional distress in the form of humiliation, damage to reputation, and strained family relations); Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 64 (1st Cir. 2005) (upholding $250,000 emotional distress award where plaintiff's personal life changed "drastically," she experienced financial difficulties, her marriage suffered, she entered a deep depression which lasted "for quite some time," and, because of the depression, she had difficulty finding subsequent employment); Koster v. Trans World Airlines, 181 F.3d 24, 35–36 (1st Cir.1999) (holding emotional damage award of $716,000 as excessive and reducing it to $250,000 where employer's conduct resulted in Plaintiff having trouble sleeping, anxiety, and family suffering).  In light of the similarity between these cases and the present one and because "[t]ranslating legal damage into money damages is a matter 'peculiarly within a jury's ken,' especially in cases involving intangible, non-economic losses" Smith v. Kmart Corp., 177 F.3d 19, 30 (1st Cir.1999), the court will not disturb the jury's award.

      ii.  Doubling of the Damages under Puerto Rico Law

  Turning to Defendant's contention that Plaintiff is not entitled to the doubling of her damages pursuant to Puerto Rico Law No. 115, the court rejects this argument for the following reasons.  First, to the extent Defendant claims that the jury should not have been allowed to consider the allegations that stemmed from Plaintiff's complaints to its human resources department, the court reminds Defendant that it is undisputed that Plaintiff filed a charge of sex discrimination, sexual harassment, and retaliation with the Antidiscrimination Unit of the Commonwealth of Puerto Rico and the EEOC on June 19, 2009 containing said allegations. (Docket No. 131 at 75.)  As such, this protected activity clearly fits within the Law 115

**Civil No. 11-2073 (GAG)**

framework. See 29. P.R. LAWS ANN. tit. 29, § 194a (noting protected activity involves complaints to an administrative forum).  Second, insofar as Defendant argues that Plaintiff's claim fails because its retaliation did not have a negative impact upon Plaintiff's "terms, conditions, compensation, location, benefits, or privileges" of her employment, as required by Law 115, the court notes that the statute's language also prohibits employers from "threaten[ing]" against an employees regarding such terms and conditions.  See 29. P.R. LAWS ANN. tit. 29, § 194a(a). Plaintiff's evidence throughout the trial revealed that she was constantly being threatened as a result of her seeking protection in both Puerto Rico and federal antidiscrimination laws. Moreover, the federal courts in this district have consistently treated a claim under Law 115 the same as a claim pursuant to Title VII's antiretaliation provision.  See Zayas-Nunez v. Selectos Campo Rico, Inc., No. 14-1464, 2014 WL 5817537, at *5 (D.P.R. Nov. 10, 2014); Godoy v. Maplehurst Bakeries, Inc., 747 F. Supp. 2d 298, 318 (D.P.R. 2010) ("Given that Law 115 requires the same adverse employment action showing as a Title VII retaliation claim, courts have treated the two claims the same." (citing Rivera Rodríguez v. Sears Roebuck de Puerto Rico, Inc., 367 F. Supp. 2d 216, 230 (D.P.R. 2005)).

Lastly, and notably, even though the jury did not explicitly decide on Defendant's liability under Law 115, Defendant failed to raise an objection to the jury verdict form, which the undersigned explained to counsel did not include a question regarding Law 115 because it is the same standard. (Docket No. 133 at 159-60.)  More so, the court suggested—and counsel agreed—that because the standard is the same, it would be easier and less confusing to the jury to only determine liability under the federal standard because a finding of the same would also hold Defendant liable under Puerto Rico Law.  As such, Defendant also failed to object to the court's initial proposed jury instruction regarding Law 115, which stated ". . . if you find that the plaintiff

7

has proven her retaliation claim under Title VII, your verdict should be for the plaintiff under Law 115," and, critically, also did not timely object to the court's failure to read said instruction to the jury. See <u>Babcock v. Gen. Motors Corp.</u>, 299 F.3d 60, 64 (1st Cir. 2002) ("no party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection") (quoting FED. R. CIV. P. 51).

Accordingly, the court finds that the jury's compensatory damages award is not "grossly excessive" to "shock the conscious" nor is it "exaggeratedly high." Additionally, pursuant to subsection b of Law 115, Plaintiff is entitled to double the amount determined as having caused the violation of said law.

### iii. Allocation of Compensatory Damages

Lastly, the court turns to Defendant's argument that the damages must be reduced in light of Title VII's statutory cap on the total amount of compensatory and punitive damages. Defendant is correct that federal law imposes a cap on the damages that may be imposed upon a losing defendant for unlawful intentional discrimination in violation of Title VII. See 42 U.S.C. § 1981a(b)(3). In this case, the total amount of damages to be awarded pursuant to Plaintiff's Title VII claim may not exceed $300,000.00 because it is undisputed that Defendant has more than 500 employees. See 42 U.S.C. § 1981a(b)(3)(D). However, no similar cap applies to Plaintiff's Commonwealth claim, namely, her claim pursuant to Law 115. See <u>Rodríguez-Torres</u>, 399 F.3d at 65. The First Circuit has held that in cases where the jury has failed to apportion the award between federal and state claims, it is "proper for the district court to allocate the compensatory portion of [the plaintiff's] award to the Commonwealth claims so as to preserve as much of the

**Civil No. 11-2073 (GAG)**

verdict as possible given the Title VII cap." Id. at 66. This method allows the court to "maximize the plaintiff's recovery while adhering to the Title VII cap.[1] Id.

In light of those principles, the court apportions the award as follows: $1.00 in compensatory damages to the Title VII claim, and the remainder of the compensatory award, $351,017.34, to Plaintiff's Law 115 claim. As discussed in section I.A.ii of this opinion, Puerto Rico law provides a victorious plaintiff with double damages, and thus, Plaintiff's award for the Law 115 claim is doubled to $702,034.68.

B. Punitive Damages

Defendant also argues that the jury's $3,500,000.00 punitive damages award should be reversed because Plaintiff failed to present any evidence indicating that Defendant engaged in retaliatory conduct with malice or reckless indifference to her federally protected rights. (Docket No. 139 at 3-8.) Further, Defendant argues that the jury punished it for what happened to Margarita Del Valle, one of Plaintiff's witnesses, because counsel for Plaintiff asked the jury to take her testimony into account when awarding punitive damages. (Id. at 9-10.) Lastly, Defendant argues that if this court finds that it did indeed act with malice or reckless indifference to Plaintiff's rights, then it asks the court to reduce the combined compensatory and punitive damages to at least $300,000—the mandatory damages cap under Title VII. (Id. at 10-11.) In her response, Plaintiff fails to recognize that the mandatory damages cap under Title VII applies to punitive damages as well as compensatory damages and, as such, argues that the jury's award comported with the

---

[1] As previously noted in section I.A.ii of this opinion, even though the jury did not explicitly decide on Defendant's liability under Law 115, Defendant failed to raise an objection to the jury verdict form and did not timely object to the court's failure to read an instruction regarding Law 115 to the jury. See Babcock, 299 F.3d at 64 ("no party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection") (quoting FED. R. CIV. P. 51).

constitutional standards set forth in the seminal case BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996) and its progeny. (Docket No. 146 at 9-12.) Plaintiff also argues in the alternative that she opts to remit a portion of the award in light of the seemingly high 10:1 ratio between the damages. (Id.) Lastly, Plaintiff argues that she submitted sufficient evidence at trial indicating that Defendant's antidiscrimination manual was totally ineffective, thus allowing for punitive damages. (Id. at 12-13.)

"Title VII authorizes punitive damages when a plaintiff demonstrates that the defendant engaged in intentional discrimination 'with malice or reckless indifference to the federally protected rights of an aggrieved individual.'" Rodríguez–Torres, 399 F.3d at 64 (quoting 42 U.S.C. § 1981a(b)(1)). In Kolstad v. American Dental Ass'n., 527 U.S. 526 [(1999)], the Supreme Court set forth a framework for determining the appropriateness of punitive damages. Following Kolstad, once a plaintiff has shown that 'the employer acted with malicious or reckless indifference to the plaintiff's federally protected rights,' 'she then must establish a basis for imputing liability to the employer.' Rodríguez–Torres, 399 F.3d at 64. [The First Circuit has] stated that 'the plaintiff may meet this burden by showing that the employee who discriminated against her was a managerial agent acting within the scope of his employment.' Id. '[E]ven if the plaintiff makes these showings, the employer still may avoid punitive liability by showing that it engaged in good faith efforts to implement an anti-discrimination policy.' Id. 'Demonstrating good faith compliance is an affirmative defense, and the burden of proof therefore rests with the employer.' Id." Monteagudo, 554 F.3d at 176.

Because the Kolstad Court did not articulate any specific evidence necessary for a finding of a good-faith effort, the First Circuit, along with our sister circuits, has added substance to the standard. Our appellate court has held that "a written non-discrimination policy is one indication

10

of an employer's efforts to comply with Title VII. . . . But a written statement, without more, is insufficient to insulate an employer from punitive damages liability." Romano v. U-Haul Int'l, 233 F.3d 655, 670 (1st Cir. 2000); see also Monteagudo, 554 F.3d at 176-77 (articulating standard). Proof of an employer's good-faith effort may include: (1) evidence of an "active mechanism for renewing employees' awareness of the policies through either specific education programs or periodic re-dissemination or revision of their written materials;" (2) "testimony by [the employer's] witnesses that indicated that supervisors were trained to prevent discrimination from occurring;" or (3) "examples in which their anti-discrimination policies were successively followed." Romano, 233 F.3d at 670. An employer need not offer evidence of all of these factors to successively assert this affirmative defense. Id.

Applying the Kolstad standard in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's supervisors were acting in managerial capacity when engaging in the retaliatory harassment. Indeed, this issue is not disputed. Further, as supervisors, they should have been aware that their actions were violating Defendant's antiretaliation policies and federal law. See Monteagudo, 554 F.3d at 176 ("as a supervisor, Arce should have been aware that his actions were against [Defendant's] sexual harassment policy and federal law"). Testimony at trial indicated that Plaintiff's supervisors were aware of Defendant's antidiscrimination and antiretaliation policies because the "Manual on General Rules of Conduct and Work" ("Manual"), in which those policies are published, was distributed to them, (see Docket No. 133 at 40-41), and was republished once a year, thus instilling in its employees an awareness of the employees' federal rights. (Docket No. 133 at 87-92.)

In cases such as the present one, the more difficult question tends to be whether the defendant sufficiently engaged in good-faith efforts to implement an antidiscrimination and/or

antiretaliation policy that precludes it from being liable for punitive damages. At trial, Defendant proffered the testimony of Carmen Pagán, a former manager of human resources for Defendant, who testified that Defendant had policies against discrimination, harassment, and retaliation in the workplace during the time Plaintiff was being subjected to the retaliatory harassment. (Docket No. 133 at 87-89.) These policies are published in Defendant's Manual, which is given to new employees, published annually, and refreshed through annual trainings through PowerPoint presentations on Defendant's intranet. (Id. at 90-92.) Further, Defendant's employees are required to take and pass a test at the end of the online training. (Id. at 92.) Although Pagán admitted on cross-examination that the policies and training were not available through the intranet until 2011, (see id. at 116), which is after the relevant retaliatory conduct took place, Plaintiff's own witness, Margarita Del Valle, testified that she was provided with a follow up or refresher course on the Manual about once a year from 1992 until she retired in 2012. (Docket No. 132 at 39-40.) Notably, Plaintiff did not attempt to rebut this fact at trial. Lastly, Defendant proffered evidence of its investigation procedure that governs internal complaints of discrimination, harassment, and retaliation made to the human resources department and discussed how Plaintiff made two complaints and that both were thoroughly investigated. (Docket No. 133 at 93-99.)

Based on the aforementioned evidence and case law from the Supreme Court, First Circuit, and our sister circuits, Defendant has provided sufficient evidence that it engaged in good-faith efforts to implement an antiretaliation policy. In contrast to cases where the employers never adopted any antidiscrimination policies or provided any training whatsoever on the subject of discrimination or failed to address the employee's complaints through an internal investigation, Defendant proffered evidence sufficient to show that it did more than merely publish an official policy and passively implement such in an attempt to comply with Title VII's requirements. The

evidence articulated above shows that Defendant had an "active mechanism for renewing employees' awareness of the policies through either specific education programs or periodic re-dissemination or revision of their written materials" and its "supervisors were trained to prevent discrimination from occurring." Romano, 233 F.3d at 670. Furthermore, Defendant proffered evidence that it has an internal complaint and investigation procedure which Plaintiff indeed availed herself of twice. This evidence cumulatively indicates that Defendant made a good-faith effort to comply with Title VII despite the discriminatory actions of its managerial agents. See, e.g., Monteagudo, 554 F.3d at 176 (upholding punitive damages award where defendant offered nothing more than an anti-harassment policy); Rodriguez-Torres, 399 F.3d at 65 (upholding punitive damages award where there was evidence that defendant's employee manual did not contain a non-discrimination policy, it did not provide its employees with antidiscrimination training, and its complaint procedure was limited to sexual harassment claims); Romano, 233 F.3d at 670 (holding evidence that the company did nothing more than adopting and distributing an antidiscrimination policy was not sufficiently compelling to require that the jury reject awarding punitive damages); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 548-49 (4th Cir. 2003) (rejecting punitive damages liability where employer had an antidiscrimination policy, established grievance policy encouraging reporting of claims, informed employees of antiretaliation stance, developed diversity training program, and voluntarily monitored departmental demographics to ensure diversity); Bruso v. United Airlines, Inc., 239 F.3d 848, 861 (7th Cir. 2001) (upholding punitive damages award despite evidence of defendant's antidiscrimination policy and education of its employees about that policy because there was evidence that defendant's top management officials disregarded the policy by refusing to remedy plaintiff's harassment even though they knew about it).

Nevertheless, Plaintiff argues that because she presented evidence that Defendant's antiretaliation policy was ineffective—i.e., that it failed to prove the Faragher/Ellerth defense—Defendant should be subjected to punitive damages. The ineffectiveness of Defendant's policy, however, cannot alone demonstrate a lack of good faith justifying an award of punitive damages. See White v. BFI Waste Servs., LLC, 198 F. App'x 283, 287 (4th Cir. 2006). "If it could, employers with [antidiscrimination] policies who failed on their affirmative defenses would automatically be exposed to punitive damages, and there would have been no need for the Kolstad Court to formulate the additional 'good-faith efforts' inquiry." Id. As such, in the present case, the mere fact that the jury found that Defendant's antiretaliation policy was ineffective does not automatically indicate that it exercised bad faith in implementing such a policy to require an award of punitive damages. Unlike the standard for reviewing the jury's compensatory damages award, Plaintiff faces a "formidable burden" in seeking punitive damages for employment discrimination, see E.E.O.C. v. Boh Bros. Const. Co., 731 F.3d 444, 467 (5th Cir. 2013), and she has failed to rebut Defendant's evidence.

Accordingly, in light of the aforementioned discussion, the court must vacate the jury's award of punitive damages pursuant to Title VII.[2] For this court to hold otherwise would be against the underlying purposes of Title VII. See Kolstad, 527 U.S. at 545-46 ("[g]iving punitive damages protection to employers who make good-faith efforts to prevent discrimination in the workplace accomplishes' Title VII's objective of motivat[ing] employers to detect and deter Title VII violations" (internal quotation marks omitted)).

---

[2] In light of the court's holding, it need not address Defendant's argument that the jury punished it for what happened to Margarita Del Valle because counsel for Plaintiff asked the jury to take her testimony into account when awarding punitive damages.

14

## II.    Conclusion

In sum, after reviewing the parties' submissions, the evidence in the record, and the pertinent law, the court **GRANTS in part** and **DENIES in part** Defendant's motion for a remittitur and declines to order a new trial with regard to the damages imposed. The court upholds the jury's compensatory damages award, as it finds that said award is not "grossly excessive" to "shock the conscious" nor is it "exaggeratedly high" and that pursuant to subsection b of Law 115, Plaintiff is also entitled to double the amount determined as having caused a violation of said law. With respect to the jury's punitive damages award, the court is bound by the precedent of the Supreme Court and First Circuit, which requires it to set aside said award because Defendant met its burden that it made a good faith efforts to implement antidiscrimination and anti-retaliation policies.

Furthermore, Plaintiff's counsel shall file a motion seeking attorney's fees by January 30, 2015, while this case is still fresh in both parties' minds. Following the submission of said motion, Defendant shall respond by February 16, 2015. Given that an appeal has been filed, the court finds it in the best interest of judicial economy to resolve this matter at this time.

**SO ORDERED.**

In San Juan, Puerto Rico this 7th day of January, 2015.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge